McDONALD, J.
In this appeal, an insured appeals a summary judgment in favor of its insurer concluding the insurer did not owe the insured a duty to defend against the plaintiffs' claims in the underlying litigation and dismissing the insured's third party demand against the insurer, with prejudice. We affirm.
FACTS AND PROCEDURAL HISTORY
This suit is one of several arising from the August 2012 appearance of a sinkhole *934 near Bayou Corne in Assumption Parish, Louisiana. EnLink f/k/a Crosstex[1] , the plaintiffs in the underlying litigation, own and operate a natural gas pipeline that traverses the edge of a salt dome. Texas Brine[2] operates brine production wells, including the Oxy Geismar # 3 well, on property above the salt dome. EnLink filed suit against Texas Brine and one of its insurers, Zurich American Insurance Company (Zurich), among others, alleging the sinkhole was caused, in whole or part, by the failure of the Oxy Geismar # 3 salt cavern and that the sinkhole engulfed a section of EnLink's pipeline, rendering the pipeline displaced, damaged, and unusable.
In response to EnLink's suit, Texas Brine filed a third party demand for declaratory judgment seeking defense and indemnity from insurers Zurich, National Union Fire Insurance Company of Pittsburgh, Pa. (National Union) and AIG Specialty f/k/a AISLIC[3] (sometimes, collectively, AIG Insurers), under certain pre-2012[4] liability policies issued to Texas United Corporation.[5]
In due course, the AIG Insurers filed a motion for summary judgment, claiming they had no duty to indemnify or defend Texas Brine in this suit, because EnLink's alleged damages did not occur during the effective date of any of the relevant policies, the last of which indisputably expired on March 1, 2009, more than three years before the sinkhole appeared. Zurich filed a motion for summary judgment, and partially joined in the motion for summary judgment filed by the AIG Insurers, claiming it had no duty to indemnify or defend Texas Brine in this suit, because EnLink's alleged damages did not occur during the effective dates of any of its relevant policies, the last of which indisputably expired on March 1, 2012, five months before the sinkhole appeared.[6]
*935 In a judgment signed February 14, 2017, the district court granted summary judgment in favor of the AIG insurers, in their capacities as Texas Brine's pre-2012 insurers, and dismissed Texas Brine's third party demand against them. Texas Brine appealed that judgment. In a judgment signed March 1, 2017, the district court granted Zurich's motion for summary judgment and Zurich's partial joinder in the motion for summary judgment filed by the AIG Insurers, dismissing all claims asserted by Texas Brine against Zurich, with prejudice. Texas Brine appealed the judgment.[7]
While the appeal was pending, EnLink apparently settled its claims against Texas Brine, and those claims were dismissed. According to Texas Brine, however, this appeal still presents the issue of whether genuine issues of material fact exist such that Zurich owed Texas Brine a duty to defend Texas Brine on the EnLink claims against it until the date those claims were resolved and dismissed.
Texas Brine contends that the district court erred in granting summary judgment to Zurich because there are genuine issues of material fact as to when EnLink's damage began that preclude summary judgment on Zurich's duty to defend. Specifically, Texas Brine argues the pre-2012 Zurich policies do not limit coverage to property damage that manifests itself during the policy period but should be interpreted to cover possible hidden property damage to EnLink that may have resulted from earth movement that may have occurred during the policy periods. Texas Brine also contends that the district court erred, because another district court in other sinkhole-related cases denied summary judgment to insurers on the duty to defend issue.
SUMMARY JUDGMENT
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. Jones v. Anderson, 16-1361 (La. App. 1 Cir. 6/29/17), 224 So.3d 413, 417. After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966A(3). The only documents that may be filed in support of or in opposition to the motion are pleadings, memoranda, affidavits, depositions, answers to interrogatories, certified medical records, written stipulations, and admissions. LSA-C.C.P. art. 966A(4).
The burden of proof rests on the mover. Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. LSA-C.C.P. art. 966D(1).
*936 Appellate courts review evidence de novo under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Jones, 224 So.3d at 417. Thus, appellate courts ask the same questions: whether there is any genuine issue of material fact and whether the mover is entitled to judgment as a matter of law. Id. Because it is the applicable substantive law that determines materiality, whether a particular in dispute is material can be seen only in light of the substantive law applicable to the case. Id.
DUTY OF DEFEND
Whether an insurance policy provides or precludes coverage is a dispute that can be properly resolved within the framework of a motion for summary judgment. George S. May Int'l Co. v. Arrowpoint Capital Corp., 11-1865 (La. App. 1 Cir. 8/10/12), 97 So.3d 1167, 1171. The party seeking a declaration of coverage under an insurance policy must establish every fact essential to recovery and that the claim falls within the policy coverage. Id. Generally, the insurer's obligation to defend suits against its insured is broader than its obligation to indemnify for damage claims. Arceneaux v. Amstar Corp., 10-2329 (La. 7/1/11), 66 So.3d 438, 450. The issue of whether a liability insurer has the duty to defend a civil action against its insured is determined by application of the "eight-corners rule," under which an insurer must look to the "four corners" of the plaintiff's petition and the "four corners" of its policy to determine whether it owes that duty. Maldonado v. Kiewit Louisiana Co., 13-0756 (La. App. 1 Cir. 3/24/14), 146 So.3d 210, 218. The insurer's duty to defend suits brought against its insured is determined by the factual allegations of the injured plaintiff's petition, with the insurer being obligated to furnish a defense unless it is clear from the petition that the policy unambiguously excludes coverage. See Arceneaux, 66 So.3d at 450. Thus, assuming the factual allegations of the petition are true, if there could be both coverage under the policy and liability to the plaintiff, the insurer must defend the insured regardless of the outcome of the suit. Id. Additionally, the court must liberally interpret the factual allegations of the petition in determining whether they bring the plaintiff's claim within the scope of the insurer's duty to defend the suit brought against its insured. Maldonado, 146 So.3d at 219. If a petition does not allege facts within the scope of coverage, however, an insurer is not legally required to defend a suit against its insured. Id.
We now review de novo the documents filed by the parties in support of and in opposition to Zurich's motion for summary judgment. See LSA-C.C.P. arts. 966A(4) and D(2). It is undisputed that Zurich provided insurance coverage to Texas United Corporation under policies effective from March 1, 2009 through March 1, 2010 and from March 1, 2010 through March 1, 2011 and from March 1, 2011 through March 1, 2012. Zurich filed pertinent excerpts from the three Zurich policies at issue in support of their motions. Generally, the Insuring Agreement of each of the policies provided, in pertinent part:
SECTION I-COVERAGES
COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY
1. Insuring Agreement.
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured *937 against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result ....
b. This insurance applies to "bodily injury" and "property damage" only if:
(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
(2) The "bodily injury" or "property damage" occurs during the policy period; ...
Also, generally, the policies defined "property damage" as:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it."
Further, each of the three pre-2012 Zurich policies at issue defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."
The Zurich pre-2012 policies provided coverage for property damage only if it occurred during the policy period. It is undisputed that no pre-2012 Zurich policy was in effect on August 3, 2012, the day the sinkhole near Bayou Corne appeared. Nevertheless, Texas Brine argues that, although EnLink may have discovered its pipeline damage on August 3, 2012, there are genuine issue of material fact as to whether hidden damage occurred before then, due to subsidence and other non-visible underground damage in the years before the sinkhole became visible. Thus, according to Texas Brine, the possibility that EnLink could have sustained damage during the pre-2012 Zurich policy periods precludes summary judgment on Zurich's duty to defend. To support its opposition to the summary judgment, Texas Brine filed three expert opinions. The first expert, William Barnhart, opined that inSAR analysis, a technique used to observe active ground surface deformation, was consistent with ground surface subsidence near the salt dome from 2007 through 2011. The second expert, John Carico, opined that pre-2012 earth movement in the Bayou Come area "could have" damaged EnLink's pipeline earlier than March 1, 2012. The third expert, Peter Knowe, opined that, "if" pre-2012 earth movement damaged EnLink's pipeline, such hidden damage would be covered under pre-2012 occurrence policies, even if the sinkhole did not appear until 2012.
We first note that, under the "eight-corners rule," Texas Brine's experts' opinions are irrelevant to determining Zurich's duty to defend Texas Brine against EnLink's claims. It is EnLink's allegations that determine Zurich's duty to defend, and Texas Brine cannot use expert opinions to add to EnLink's allegations, or to dictate a certain interpretation of EnLink's allegations, in its attempt to defeat summary judgment on the duty to defend issue. See Vaughn v. Franklin, 00-0291 (La. App. 1 Cir. 3/28/01), 785 So.2d 79, 85, writ denied, 01-1551 (La. 10/5/01), 798 So.2d 969 (rejecting insurer's argument to look beyond allegations of petition to determine duty to defend). Further, even if we did consider the expert opinions, they do not create a factual dispute as to whether EnLink sustained property damage during any of the specific, relevant policy periods, *938 but only speculation that such could have occurred before March 1, 2012.
We now review EnLink's petition to determine if it alleged that property damage occurred during any of the pre-2012 Zurich policy periods. EnLink filed its original petition against Texas Brine in April 2013 and then amended it multiple times. In support of their respective positions on summary judgment, Zurich and Texas Brine both point to allegations from EnLink's petition, including the original, first amended, second amended, and fifth amended and restated petitions. We summarize pertinent allegations as follows, italicizing words and phrases relevant to EnLink's damages:
• EnLink owns/operates a petroleum gas storage facility situated near Bayou Corne; EnLink also owns/operates a pipeline that traverses the western edge of the Napoleonville salt dome near the Oxy Geismar # 3 brine production salt cavern.
• Since 1975, Texas Brine has leased the right to produce salt from land located on the salt dome.
• In 1982, Texas Brine and a land lessee drilled the Oxy Geismar # 3 well and Texas Brine remained the operator at least until 2015.
• In 1984, Texas Brine was informed of concerns about Oxy Geismar # 3's proximity to the edge of the salt dome; Texas Brine knew or should have known of all risks related to drilling and mining of the Oxy Geismar # 3 and had a duty to operate the Oxy Geismar # 3 as a prudent operator and in a reasonable manner.
• In at least 2007, Texas Brine became aware that the Oxy Geismar # 3 cavern was mined so close to the edge of the salt dome so as to threaten the cavern's integrity but continued to operate on the cavern.
• In about March 2009, Texas Brine ceased mining the Oxy Geismar # 3 well, and in June 2011, Texas Brine plugged and abandoned the Oxy Geismar # 3 well.
• Beginning in May 2012, reports were made that natural gas was bubbling to the surface of waterways near the salt dome, which forced EnLink to perform continuous inspections, monitoring, probing, excavation, surveying, gas sampling and analysis, and related permitting to ensure the integrity of its pipelines in the area.
• On August 3, 2012, a sinkhole emerged adjacent to EnLink's pipeline and has since engulfed a section of the pipeline.
• EnLink's pipeline was displaced, damaged, and rendered unusable due to the sudden soil subsidence, earth movement, and soil instability caused when the sinkhole occurred.
• The failure of the Oxy Geismar # 3 cavern caused, in whole or in part, the sinkhole and associated soil subsidence and instability; the Oxy Geismar # 3 cavern is unstable and continues to collapse.
• EnLink has incurred substantial damage from the sinkhole, and Texas Brine's role in causing or contributing to the sinkhole renders it directly liable to EnLink for damages sustained as a result of the sinkhole emergence.
• Due to the salt dome's potential instability, caused by the Oxy Geismar # 3 cavern failure, EnLink conducted structural integrity tests of its caverns and has transferred butane from an adjacent cavern to a more remote cavern.
*939 • Due to the Oxy Geismar # 3 cavern failure, EnLink was prevented from expanding its storage facility as planned; lost storage cavern contracts with third parties; and, was required by state agencies to take responsive actions to the incident.
• Acts by Texas Brine, Texas United, and United Brine, and defective things they owned or over which they had garde, caused or directly contributed to the destabilization of the Oxy Geismar # 3 cavern and the eventual formation of the sinkhole causing damages to EnLink.
• Texas Brine's fault caused EnLink the following damage, without limitation: expenses associated with testing to determine the source of natural gas releases and subsequent gas monitoring; lost revenues associated with the shutdown of the pipeline; costs to relocate the pipeline; anticipated demolition costs for removing the pipeline's unusable section; expenses associated with salt dome and cavern structural integrity tests; costs and lost revenues associated with product transfers between caverns; lost storage cavern contract revenue; lost future revenue from lost facility and business expansion opportunities; costs to respond to state agency directives; interest, and other damages to be proven at trial.
Although there are some factual differences between this case and Crosstex Energy Services, LP, et al. v. Texas Brine Company, LLC, et al., 2017 CA 0863, the language found in Zurich's pre-2012 insurance policies in this case and the AIG Insurer's pre-2012 insurance policies in 2017 CA 0863 is substantially the same, the allegations of EnLink are the same in both cases, and the arguments by the parties on appeal are the same. Thus, for the reasons set out by this court in Crosstex Energy Services, LP, et al. v. Texas Brine Company, LLC, et al., 2017 CA 0863, we find the district court properly granted summary judgment in Zurich's favor.
CONCLUSION
For the reasons assigned by this court in Crosstex Energy Services, LP, et al. v. Texas Brine Company, LLC, et al., 2017 CA 0863, the district court's March 1, 2017 judgment, granting summary judgment in favor of Zurich American Insurance Company and dismissing Texas Brine's third party demands against it with prejudice, is affirmed. We assess the costs of this appeal to Texas Brine.
AFFIRMED.

The original petition was filed by Crosstex Energy Services, LP; Crosstex LIG, LLC; and Crosstex Processing Services, LLC (Crosstex). In March 2014, the plaintiffs' names changed, respectively, to EnLink Midstream Operating, LP; EnLink LIG, LLC; and EnLink Processing Services, LLC. We sometimes refer to the plaintiffs in the underlying litigation as EnLink.

In the original petition, EnLink named Texas Brine Company, LLC, as the defendant who operated the wells. In a fifth supplemental, amended, and restated petition, EnLink additionally named Texas United Corporation and United Brine Services Company, LLC, as defendants, claiming they were both alter egos of Texas Brine Company, LLC, which acted in concert with and/or as part of Texas Brine Company, LLC, in causing EnLink's damages. We sometimes refer to these three defendants as Texas Brine.

In the original third party demand, Texas Brine named National Union, American International Surplus Lines Insurance Company (AISLIC) and American International Specialty Lines Insurance Company (also AISLIC) as third party defendants. In responsive pleadings, including their motion for summary judgment, those third party defendants identify themselves as National Union and AIG Specialty Insurance Company f/k/a AISLIC and AISLIC. We sometimes collectively refer to those third party defendants as the AIG Insurers.

Although the last Zurich insurance policy at issue in this case expired on March 1, 2012, throughout the litigation the parties refer to the Zurich polices at issue in this case as "pre-2012" polices. For consistency, we use the same "pre-2012" policies language.

The relevant policies identify Texas United Corporation as the insured. For purposes of the motion for summary judgment only, without waiving their right to contest Texas Brine's status, the AIG Insurers allowed Texas Brine to be considered an additional insured.

Zurich noted that EnLink did not seek, and had never sought, a direct action claim under any of Zurich's pre-2012 insurance policies.

The district court heard the motions for summary judgment at the same hearing and then issued one judgment in Zurich's favor and another judgment in the AIG Insurers' favor. We review the Zurich judgment here, under docket number 2017 CA 0895, and the AIG Insurers' judgment under docket number 2017 CA 0863, also decided this day.